UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

CONSUELA SMITH-WILLIAMS,
FRED RIVERS, RICHARD MURPHY,
ROBERT RISTOW, ROGER SUHR,
and SALVADOR FUENTES, individually,
and on behalf of all similarly situated,

     *Plaintiffs,*     Case No.: 17-CV-823

v.

THE UNITED STATES OF AMERICA,

     *Defendant.*
_____/

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION**

   The Plaintiffs, Consuela Smith-Williams, Fred Rivers, Richard Murphy, Robert Ristow,

Roger Suhr and Salvador Fuentes, individually and on behalf of all similarly situated, and by and

through their undersigned counsel, hereby file this Memorandum in support of Plaintiffs' Motion for

Class Certification and state as follows:

**Background**

   Between October 5, 2015 and October 21, 2016, the Defendant's employee, Dr. Thomas

Schiller, provided dental treatment to the Plaintiffs and Putative Class Members in the dental clinic at

the Tomah VA Medical Center. See *Exhibit A* at 1, *Exhibit B* at 11, *Exhibit C* at 1, and D.E. 29 at 3.

See also Smith-Williams Dec. at 1, Rivers Dec. at 1, Murphy Dec. at 1, Ristow Dec. at 1, Suhr Dec.

at 1, Fuentes Dec. at 1.While treating the Plaintiffs and Putative Class Members, Dr. Schiller failed to

observe basic infection control practices such as hand washing, failed to wear personal protective

equipment, used his own personal equipment, (including un-sterile dental burs) and was occasionally

observed by the dental clinic staff to be asleep at his desk during regular work hours.[1] *Exhibit B* at ii-iii ("Dentist A acknowledged that he had used a non-VA unsterile bur on the day in questions as he had with prior patients."). [2] *Id* at ii. ("Dr. Schiller was reported to have poor handwashing habits (failure to wash hands during or after procedures), glove protocol was not followed (choosing to keep the gloves on when working on the CPU during a procedure) and did not always wear proper PPE (gowns) when seeing or treating patients."). *Exhibit D* at 3. ("Dr. Schiller knowingly diverted from the known processes concerning sterile, one-time use burs.") *Id*. See also *Exhibit E* 19:6-8 ("He would sleep behind his desk. Everybody in the clinic knew about it because it was a big joke."). ("His infection control was awful. He touched everything with his contaminated gloves.") *Id* at 30:5-6. ("I would not let him work on my family and friends.") *Id* at 15:17-18. ("I don't even know how he got his license to be honest.) *Id* at 18:12-13.

For over a year, Dr. Schiller breached the infection control and prevention standards established by the American Dental Association, the Occupational Safety and Health Administration, the Center for Disease Control and Prevention, and the Department of Veteran's Affairs. See *Exhibit B* at i; *Exhibit D* at 3; *Exhibit F* at 6, 8,9,14,17,18,34; *Exhibit G* at 6. See *Exhibit B* at 6 ("Between October 2015 and October 2016, Dentist A potentially exposed 592 patients to BBP (blood borne pathogens) at the facility Dental Clinic due to improper infection control practices.). (Insert added.).

Dr. Schiller did not hide his infection control breaches from the other Dental Clinic employees.[3] *Exhibit E* at 38:21-22, 39:1-4. See also *Exhibit D* at 4 ("The majority of the staff had mentioned Dr. Schiller's lack of compliance with known infection control, hand washing, and

---

[1] Dr. Schiller was not intentionally trying to harm the Plaintiffs and Putative Class Members. See Brahm Tr. at 9:24-25, 10:1-8(**Q:** You say it was purposeful. You mean it was purposeful that he was breaching infection control standards or purposefully trying to hurt the veterans? A: I don't think it was malicious…**Q:** Did anything in the investigation uncover that he was attempting to hurt anybody? A: No, not to my knowledge).

[2] The VA Office of Inspector General referred to Dr. Schiller as "Dentist A" in its investigative report.

[3] (**A:** "…I don't know how anybody couldn't have seen those burs. **Q:** why do you say that? **A:** Because they weren't ever hidden. He didn't hide them. He set them right on top of the sterile burs in our cabinet."). *Exhibit E* at 38:21-22, 39:1-4

universal precautions.").[4] Lori Cleaver, the dental assistant assigned to Dr. Schiller, and Sara Wagner, the lead dental hygienist, were aware that Dr. Schiller was using his own personal equipment, including unsterile dental burs, during the Plaintiffs and Putative Class Members' procedures. See *Exhibit B* at iii, *Exhibit D* at 2. Ms. Cleaver informed the Chief of Dental Services, Dr. Frank Marcantonio, about Dr. Schiller's poor hygiene, his failure to use personal protective equipment, and that he occasionally appeared to be sleeping at his desk, however, Dr. Marcantonio failed to take any action to prevent Dr. Schiller from breaching infection control standards.[5] See Exhibit B at iii "We found no documentation that facility leadership counseled Dentist A for poor hand hygiene, the non-compliant use of PPE, sleeping at his desk, or the use of non-VA unsterile burs." See *Exhibit E* at 32:11-15 ("Dr. Mark never followed through with anything…Dr. Mark would catch him sleeping and he was like, 'Hey Lori come here' and he'd bring me out in the hall, and he's like 'your doctor is sleeping.'"). [6]  See also Brahm Tr. at 43:10-13 (**Q**: Do you think the VA should have fired Dr. Schiller once it became apparent that he was breaching these infection control standards? **A:** Absolutely."). Despite these ongoing infection control breaches, no one in the Dental Clinic, including Dr. Marcantonio, filed an ePER[7], or reported these infection control breaches to anyone in a leadership position outside of the Dental Clinic. *Exhibit B* at 8.

When Dr. Marcantonio approved Dr. Schiller's employment in the Dental Clinic he indicated that he would monitor Dr. Schiller closely due to concerns about prior tort claims filed against Dr.

---

[4] "…I told him about his hygiene, him not washing his hands before or after a patient, him touching everything of mine, including my mouse with his dirty contaminated gloves…I told everybody that…I told Dr. Mark…I told Corina one of our hygienists…I told Sara Wagner, my supervisor. I told Lisa Randall, Dr. Jackson, Sara Anderson. Everybody knew." *Exhibit E* at 53:2-12. (**A:** There's a lot of times Sara Anderson and Dr. Mark would be in their operatory, and I go in…Sara would go 'what did Dr. Schiller do today?' and so then we would just, you know, 'I had to wake him up for his first patient'…everybody knew about it. **Q:** Dr. Mark would be in the room? **A:** Yeah.) *Exhibit E* at 59:4-15.
[5] The Chief of Dental Services is responsible for ensuring that the facility dental program complies with VHA regulations, directives handbooks, and policies pertaining to dental clinic operation. *Exhibit B* at 9.
[6] Lori Cleaver referred to the Tomah VA Medical Center Chief of Dental Services, Dr. Frank Marcantonio, as "Dr. Mark" during her interview with the VA Office of Inspector General.
[7] Electronic patient Event Reporting (ePER) is a computer software application located on Tomah VA desk tops for reporting adverse events involving patients. *Exhibit B* at 7.

Schiller. See *Exhibit H*. But see: Brahm Tr. at 34:8-14 (**Q:** Does it seem to you that Dr. Marcantonio was monitoring and supervising Dr. Schiller as he should have been based on what Dr. O'Brien found? **A:** If these employees statements are true, he would not—that would not—if these are true, then—no…).  On May 16, 2016, Dr. Marcantonio signed Dr. Schiller's focused professional practice evaluation form, citing: "no concerns regarding competency." *Exhibit B* at 11. Dr. Marcantonio also appointed Dr. Schiller to the Tomah VA Medical Center infection control committee. "Dr. Schiller was on the Infection Control Committee…he was supposed to be over seeing hand hygiene." *Exhibit I* at 3.[8] ("…basically it kind of fell through the cracks...Dr. Schiller was supposed to take it over, this hand hygiene control thing...we would have to fill out these forms and that never got done.) *Exhibit E* at 58:5-15.

Dr. Schiller would bring a black duffle bag to the Dental Clinic which contained his personal medication, and which also contained personal items he used during the Plaintiffs' and Putative Class Members' dental procedures. See *Exhibit D* at 2 "Lori Cleaver witnessed Dr. Schiller use items out of his 'bag of goodies' that he would bring in for his own use…matrix bands, post-drill kits, copper bands, and a type of gauze." "He had all kinds of medicines he would take every day in his black bag." *Exhibit E* at 21:10-11. While employed at the Tomah VA Medical Center, Dr. Schiller took two medications for blood pressure, two medications for migraines, and "anti-anxiety medications, including but limited to: Xanax (anti-anxiety for really bad episodes [necessitated daily at the Tomah VA due to stress]), BuSpar(anti-anxiety), and Celexa (anti-anxiety)." *Exhibit J* at 1.  During clinical hours he was observed by Dr. Marcantonio to be impaired to the point where he would mumble unintelligibly. ("Dr. Mark goes 'you can barely understand him. He's mumbling and just kind of out of it'…I mean with patients, patients couldn't even understand him. They'd look at me and say, 'what did he say?' and I'd have to explain.") *Exhibit E* at 22:10-16.

---

[8] (**Q:** How does…someone generally get appointed or become a member of a committee? **A:** …the dental chief would be contacted and asked for a member. **Q:** Dr. Marcantonio? **A:** Right.) Brahm Tr. at 50:8-17.

Before inspections of the Dental Clinic, Dr. Marcantonio would advise the dental clinic staff to remove their personal items from their operatories so they would pass inspection. [9] *Exhibit E* at 68:16-22. See also *Exhibit B* at 6,7 (We identified two factors that contributed to facility leadership not being aware sooner of Dentist A's improper infection control practices. These factors included" (1) a failure of staff…to report Dentist A's breach of infection control practices…and (2) advanced notification and other issues associated with Dental Clinic inspections.)

During the time Dr. Schiller treated the Plaintiffs and Class Members, the Tomah VA Medical Center had a pervasive culture of intimidation towards employees who spoke out about substandard patient care, and a standard practice of retaliating against employees who spoke out.

**Q:** In January 2015 the center for investigative reporting revealed a pervasive culture of intimidation and retaliation against employees...who spoke out. Is that what you are referencing?

**A:** Right. Much of that coming from the previous chief of staff. Brahm Tr. at 14:20-25, 15:1-11.

**A:** There were some areas where there was some bullying and intimidation by the previous leadership. That's one of the reasons that, you know, they are not here anymore. So there was not necessarily an environment of psychological safety in those years. Brahm Tr. at 14:14-19.

The fear of reprisal which persisted at the Tomah VA Medical Center allowed Dr. Schiller's infection control breaches to go un-reported for more than a year.

**Q:** You think it's a fear of reprisal, intimidation situation?

**A:** That is what one of the dental assistant finally came forward with when we investigated this whole situation.

**Q:** What do you think? **A:** I believe her. Brahm Tr. at 36:20-25, 37:1.

---

[9] After the ongoing infection control breaches in the Dental Clinic were revealed, Dr. Marcantonio refused to speak with VA Office of Inspector General investigators. See *Exhibit B* at ii. He also refused to answer any substantive questions at his September 25, 2018 deposition, and asserted his 5th Amendment privilege against self-incrimination. See Marcantonio Tr. at 6:19-25, 7:1-3.

**Q**: …Do you think the VA's permitting of a culture of fear to take place and to exist in the facility—do you think the VA then bears some responsibility for this incident?

**A:** I feel the senior leadership of the facility should take accountability and that is why they are no longer here. I feel there is. Brahm Tr. at 38:1-7.

**Q:** And they created a culture of fear and culture of intimidation as opposed to a culture where you see something, you say something; if you see an adverse event you report it?

**A:** Correct.

**Q:** Is that accurate?

**A:** Yes. Brahm Tr. at 38:17-24.

**A:** …I think that they were afraid that—at least she was afraid to come any further for fear of reprisal. **Q:** And you think that that's a training issue?

**A:** I think it's a culture issue. And the training helps… Brahm Tr. at 37:1-20.

**A:** So I think we're in the middle of shifting in the right direction. Unfortunately, not all these employees felt safe. Brahm Tr. at 37:1-20.

See *Exhibit* D at 4 ("Recommendations 1. Conduct no fear of reprisal training for the entire dental service.").

Finally, in or around mid-October 2016, a substitute dental hygienist witnessed Dr. Schiller using an unsterile dental bur while treating a patient. *Exhibit B* at iv.  On October 20, 2016, while Dr. Schiller was out of the dental clinic, the substitute dental hygienist reported what she had witnessed to the acting chief of dental services who later reported the incident to Tomah VA Medical Center managers. *Id*. When confronted by Tomah VA Medical Center managers, Dr. Schiller freely admitted to using and re-using unsterile dental burs, and informed them that he believed it was a common practice. *Id* at 6. At that point, all of Dr. Schiller's infection control breaches came to light. See *Exhibit D* at 2-4.

The Defendant conducted a risk assessment, consulted with infection control experts, and recognized that Dr. Schiller's patients were at risk of having been infected with deadly viruses such as Hepatitis B, Hepatitis C, and HIV.[10] *Exhibit A* at 1. *Exhibit B* at iv-v. Moore Tr. at 17:23-25. See also *Exhibit B* at 6 ("Between October 2015 and October 2016, Dentist A potentially exposed 592 patients to BBP (blood borne pathogens) at the facility Dental Clinic due to improper infection control practices.). (Insert added). The Defendant reviewed its records and identified the 592 veterans who were treated by Dr. Schiller: The Plaintiffs and Putative Class Members. (**Q:** 592 is the number that was ultimately determined were potentially at risk from Dr. Schiller's infection control practices. Is that accurate? **A:** Yes.). Moore Tr. at 21:17-20. On or about November 29, 2016, the Tomah VA Medical Center sent a notification letter to all 592 Plaintiffs and Putative Class Members which stated in pertinent part:

> *Our records indicate that between October 2015 and October 21, 2016 you were seen as a patient in the Tomah VA Medical Center's Dental Clinic for a dental procedure. This letter is to inform you that established infection control practices were not being followed by the dentist that treated you. While we believe the risk of infection is low, we recommend you come in to be tested….The laboratory test we are recommending you be tested for include the Hepatitis B virus, Hepatitis C virus,  and the Human Immunodeficiency Virus (HIV)….We encourage you to come in to have the recommended lab tests completed as soon as possible….As the Acting Medical Center Director, let me sincerely apologize for the concern that this notification may bring to you and your family.*

See *Exhibit A*. See also *Exhibit B* at 14 ("Facility leaders made a large-scale disclosure to the 592 patients treated by Dentist A…and sent letters to all 592 patients."). The Plaintiffs and Putative Class

---

[10] The Defendant spent more than a month conducting a risk assessment and investigation before sending notification letters to the Plaintiffs and Putative Class Members. See Brahm Tr. at 51:25, 52:1-9.

Members then scheduled and underwent blood testing to determine whether they had been infected with Hepatitis B, Hepatitis C, and/or HIV, and waited for their results. (**Q:** So after concluding your assessment…did you ultimately recommend the veterans treated by Dr. Schiller undergo testing to see if they had been infected with HIV, Hepatitis B, and Hepatitis C? **A:** Yes.) Moore Tr. at 27:4-10.

The Plaintiffs and Class Members who received dental care during the six months preceding the mailing of the notification letter were forced to wait an additional six months for further blood testing due to the time it takes for these viruses to become detectible after exposure.

> "As we discussed these tests may not always be able to reliably detect recent exposures and infections from these viruses. As you know your last visit to the Tomah VA Dental Clinic occurred within the last 6 months, and we have ordered repeat testing to be completed at the end of the 6 month timeframe." *Exhibit K.*

Thereafter, Plaintiffs and Putative Class Members received blood test results indicating that they had not been infected with any of the enumerated viruses. (**Q**: Were there any veterans who were not known to be positive for a virus who tested positive…for the first time after having been treated by Dr. Schiller? **A:** …So there were no active infections in those patients.) Moore Tr. at 27:16-24. See also Smith-Williams Dec. at 2, Rivers Dec. at 2, Murphy Dec. at 2, Ristow Dec. at 2, Suhr Dec. at 1, Fuentes Dec. at 2.

From the time the Plaintiffs and Putative Class Members received the notification letter until they received their blood test results indicating that they had not been infected with a deadly virus, they suffered severe emotional distress. See *Exhibit L* at 3, *Exhibit M* at 3, *Exhibit N* at 3, *Exhibit O* at 3, *Exhibit P* at 3, *Exhibit Q* at 3. See also Rieder Dec. at 1. During that time, the Plaintiffs and Putative Class Members were forced to consider that they may have been infected with deadly viruses, may die as a result of having been infected, and/or may have unknowingly infected their loved ones with

deadly viruses. [11]  See e.g., *Exhibit O* at 3-4 "We were all very upset. I was worried that I had been infected that I could die or that I may have infected my wife. I had been through a lot in life and the thought that I could die from one of these diseases was terrible." *Exhibit Q* at 3 "It made me feel like I was back in Iraq, worried for my life. I was worried that I might have infected my wife or that if I died my wife would have to look after our kids by herself." *Exhibit M* at 3 "I was scared to death. I couldn't believe I made it through Vietnam only to die from AIDS or Hepatitis because of the VA. I was worried about my son not having anyone if I died. Dying from one of those diseases is not a quick way of dying and I didn't want to die like that."

The Defendant knew the Plaintiffs and Putative Class Members would suffer severe emotional distress upon learning that they may have been infected with deadly viruses. See *Exhibit A* at 2 ("As the Acting Medical Center Director, let me sincerely apologize for the concern that this notification may bring to you and your family.").

**Q:** You knew you were delivering bad news?

**A:** Yes.

**Q:** You knew that they'd be frightened?

**A:** It could be frightening, yes.

**Q:** It could be frightening to learn that you may have been exposed to a deadly virus?

 **A:** (Over counsel's objection) Yes.

**Q:** Do you think their spouses and loved ones would be frightened?

**A:** (Over counsel's objection) Yes, they could be.  Brahm Tr. at 59:19-25, 60:1-9.

---

[11] The Plaintiffs' and Class Members' fear was well founded. During the risk assessment, it was determined that twenty of Dr. Schiller's patients were previously known to have Hepatitis C, three were previously known to have with Hep B and one was previously known to have HIV. See Moore Tr. at 20:15:25, 21:1-10. See also Moore Tr. at 39:15-25, 41:12-17 (patient-to-patient transmission of BBP (blood borne pathogens) can occur when lapses in basic infection prevention practices allow patients who are infected with HBV or HCV to serve as an indirect source of pathogens for disease transmission to other patients.) (Insert added).

On April 24, 2017, the Defendant received written notification that the Plaintiffs were asserting claims for negligent infliction of emotional distress on behalf of themselves and on behalf of their fellow veteran Putative Class Members. See *Exhibit R* at 1-2. The Defendant was advised of the facts giving rise to the claims and a demand was made for $50,000.00 for each Plaintiff and Putative Class Member. *Id.* The Defendant was in possession of all the Putative Class Member's medical records and was capable of contacting each of the Putative Class Members, as it had previously delivered a notification letter to each one notifying them of their risk of infection with deadly viruses. *Exhibit A* at 1. *Exhibit B* at iv-v. The Defendant did not request proof of the Plaintiffs' authority to represent the Putative Class Members and, in fact, refused to even acknowledge that it had received notification of the claims made on behalf of the putative class. *Exhibit S* at 1-2. After presenting their claims, and the claims of the Putative Class Members, to the Department of Veterans Affairs the Plaintiffs waited for six months. However, the Defendant failed to respond to their claims. On November 1, 2017, the Plaintiffs filed a negligence action against the Defendant on behalf of themselves and a similarly situated class defined as:

> All Tomah VA Medical Center patients who received dental care between October 2015 and October 2016, received a letter from the Tomah VA Medical Center informing them of their potential exposure to Hepatitis B, Hepatitis C, and HIV and subsequently tested negative for newly acquired active viral infections.

The Plaintiffs recognized a subclass defined as:

> All Tomah VA Medical Center patients who received dental care between October 2015 and October 2016, received a letter from the Tomah VA Medical Center informing them of their potential exposure to Hepatitis B, Hepatitis C, and HIV, subsequently tested negative for newly acquired active

viral infections, and were forced to wait an additional six months for further blood testing to confirm that they were not infected with Hepatitis B, Hepatitis C, and HIV.

**Argument**

A two-step analysis governs certification of a class action under Rule 23. *Schilling v. PGA, Inc*., 293 F. Supp. 3d 832 (W.D. Wis. 2018) (citing *Messner v. Northshore Univ. Health System*, 669 F. 3d 802, 811 (7th Cir. 2012). First, a class must satisfy the four threshold requirements of Rule 23(a): numerosity, commonality, typicality and adequacy of representation. *Id*. Second, the party seeking certification must satisfy one of the three alternatives under Rule 23(b). *Id*. Rule 23(b)(3) applies if questions of law or fact predominate over any questions affecting only individual members and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. *Boutell v. Craftsman Painting, LLC.,* 2018 WL 1866089. (W.D. Wis. 2018). Relevant actors include (A) the class members' interest in individually controlling the prosecution or defense of separate actions; (b) the extent of and nature of any litigation concerning the controversy already begun by or against the class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A-D).

### a.   Rule 23(a) Requirements

**NUMEROSITY (Fed. R. Civ. P. 23(a)(1))**

To satisfy Rule 23's numerosity requirement the proposed class must be so numerous that joinder of all members is impractical. *Mulvania v. Sheriff of Rock Island County*, 850 F. 3d 849, 859

(7th Cir. 2017) (citing Fed. R. Civ. P. 23(a)(1)). While there is no magic number that applies to every case, a forty-member class is often regarded as sufficient to meet the numerosity requirement. *Id* (citing *Swanson v. American Consumer Industries, Inc*., 415 F. 2d 1326, 1333 & n.9 (7th Cir. 1969)). This is consistent with the rule of thumb adopted in most courts…that proposed classes in excess of 40 generally satisfy the numerosity requirement. *Shilling* at 837 (citing 1 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 4:5 (8th ed. 2011)). See *Musch v. Domtar Industries, Inc*., 252 F.R.D. 456, 459 (W.D. Wis. 2008), in which this Court found: "Based on these facts it is reasonable that the potential class could easily reach over a hundred members. Over a hundred potential class members makes the class so numerous that joinder of all members would be impractical." See also *McHugh v. Madison-Kipp Corporation*, 2012 WL 12996296 (W.D. Wis. 2012) (finding that it would be inefficient or join 80 class members, "or even 34" for the purpose of resolving the discrete issues pertaining to the defendant's liability). In *McHugh* the court found:

> "If each potential class member proceeded individually on these issues, each plaintiff would have the opportunity to obtain his or her own counsel and experts, participate in discovery and present individual arguments and facts. This would be burdensome for the court and the parties. Because these liability issues are discrete issues common to all potential class members, it makes sense to resolve them on a class wide basis, requiring only one set of submissions from Plaintiffs….joinder of the class members at this stage would be inconvenient, inefficient, and therefore impracticable." *Id* at *3.

In this case, the proposed class consists of the Defendant's 592 patients who were exposed to the risk of infection by Dr. Schiller. Just as in *McHugh*, the Plaintiffs contend that issues directed at the Defendant's liability can be determined on a class wide basis. In determining whether joinder is impractical, courts consider the potential size of the class as well as other considerations such as the type of relief sought and the 'practicality of relitigating the central issues of the controversy.'

*Thompson v. Retirement Plan for Employees of S.C. Johnson & Sons, Inc*., 265 F.R.D. 405 (E.D. Wis. 2010) (citing *Quiroz v. Revenue Production Management, Inc*., 252 F.R.D. 438, 441 (N.D. Ill 2008). In the present case, it would be impractical and burdensome for the parties and the Court if each Plaintiff and Putative Class Member had to relitigate these central issues directed at the Defendant's liability, which could be determined on a class wide basis. The proposed class of 592 members is so numerous that joinder of each class member is impractical.

## COMMONALITY (Fed. R. Civ. P. 23(a)(2))

Rule 23(a)(2) requires plaintiffs to establish the existence of "questions of law or fact common to the class." *Williamson v. S.A. Gear Company, Inc*., 2018 WL 2735593 (S.D. Ill. 2018) (citing Fed. R. Civ. P. 23).  A common nucleus of operative facts is usually enough to satisfy the commonality requirement of Rule 23(a)(2). *Rosario v. Livaditis*, 963 F. 2d 1013, 1017 (7th Cir. 1992). A single common issue will do, if it is capable of class wide resolution-which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke. *Schilling* at 827 (citing; *Walmart v. Dukes*, 131 S. Ct. at 2551, 2556 (2011)).

Here, the Defendant's employee, Dr. Schiller, exposed the Plaintiffs and Putative Class Members to the risk of infection with deadly viruses. Upon learning that they may have been infected they suffered severe emotional distress. In its Answer and Affirmative Defenses, the Defendant denies liability. See D.E. 29 at 19-20.

The Plaintiffs contend, and have obtained evidence to support their contention, that the Defendant breached its duty to the Plaintiffs and Putative Class Members by failing to adequately train, supervise and retain its employees between October 5, 2015 and October 21, 2016. The Plaintiffs further contend, and have obtained evidence to support their contention, that the Dr. Schiller was acting within the scope of his employment with the Defendant when he exposed the

Plaintiffs and Putative Class Members to the risk of infection with deadly viruses. The truth or falsity of these statements can be determined on a class wide basis.

Common questions include: Did the Defendant adequately train its employees in the dental clinic to follow infection control standards? Did the Defendant adequately supervise its employees in the dental clinic to ensure that they were following infection standards? Did the Defendant adequately train its employees in the dental clinic to report breaches of infection control?  Did the Defendant adequately supervise its employees in the dental clinic to ensure that they reported breaches of infection control standards? Was Dr. Schiller acting within the scope of his employment with the Defendant when he exposed the Plaintiffs and Putative Class Members to the risk of infection?

The answers to these questions will advance this case. See *Phillips v. Sheriff of Cook County*, 828 F. 3d 541 (7th Cir. 2016) ("In the wake of *Wal-Mart*, we have made clear that a prospective class must articulate at least one common question that will actually advance all of the class members claims."). This Court can determine whether the Defendants' employees were properly trained, and whether there was proper supervision in the dental clinic, on a class wide basis without having to make individualized determinations. Similarly, the Court can examine the relationship between Dr. Schiller and the Defendant and determine whether, based on the principles of agency, respondeat superior liability exists, especially here where the only evidence in the record establishes that Dr. Schiller's conduct was merely negligent and not intentional. A determination of these issues on a class wide basis will prevent duplicative discovery and multiple trials regarding the same issues directed at the Defendant's liability.

 If the Court determines that the Defendant breached its duty to train, supervise and retain its employees, or that Dr. Schiller was acting within the scope of his authority, the Plaintiffs and Putative Class members may still be required to make individual showings regarding causation and damages at in a later proceeding. However, these issues directed at liability will still have been determined on

14

a class wide basis. See *Pella Corp. v. Saltzman*, 606 F. 3d 391, 394 (7th Cir. 2010)). See also *Suchanek v. Sturm Foods, Inc.,* 764 F. 3d 750, 756 (7th Cir. 2014) (Neither Rule 23 nor any gloss that decided cases have added to it requires that every question be common. It is routine in class actions to have a final phase in which individualized proof be submitted.) *Id.* See also *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 381 (7th Cir. 2015). If the Court determines that the Defendant adequately trained, supervised and retained its employees and/or that Dr. Schiller was acting outside the scope of his authority between October 5, 2015 and October 21, 2016, then those determination will exonerate the Defendant with regard to these liability issues on a class wide basis. See *Id* at 379.

Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question. *Suchanek at* 756 (citing; *Pella Corp. at* 394). In this case, the same conduct by the Defendant (it's breach of infection control standards and its failure to adequately train, supervise and retain its employees) gave rise to the Plaintiffs' and Putative Class Members' claims of emotional distress. See *Mejdrech v. Met-coil Sys. Corp.,* 319 F. 3d 910,911 (7th Cir. 2003) (finding common questions whether defendant unlawfully leaked dangerous chemicals and whether the chemicals contaminated the contiguous area underlying class members homes). Accordingly, Plaintiffs have satisfied the commonality prerequisite.

## TYPICALITY (Fed. R. Civ. P. 23(a)(3))

Under the typicality requirement, the focus is on whether the representative plaintiff's claim is based on the same legal theory and arises from the same course of conduct that gives rise to the claims of the other members of the proposed class. *Musch* at 460 (citing *Rosario v. Livaditis*, 963 F. 2d 1013, 1018 (7th Cir. 1992)). Even though some factual variations may not defeat typicality, the requirement is meant to ensure that the named representative's claims have the same essential

characteristics as the claims of the class at large. *Oshana v. Coca Cola Co*., 472 F. 3d 506, 514 (7th Cir. 2006). The record shows that the Plaintiffs and Putative Class Members were all seen in the same dental clinic, were treated by the same dentist, during the same time period, were all exposed to the risk of infection with deadly viruses, all received a notification letter from the Defendant advising them of their risk, and all tested negative for new active viral infections. Further, as all the Putative Class Members' claims arise from the from the same course of conduct, it follows that their claims sound in the same legal theory: negligent infliction of emotional distress.

"Applied with care [Typicality] should ensure that 'a plaintiff with typical claims will pursue his or her own self-interest in the litigation and in so doing will advance the interests of the class members, which are aligned with…those of the representative.'" *Shilling* at 838 (citing *Insolia v. Phillip Morris, Inc*., 186 F.R.D. 535, 544 (W.D. Wis. 1998) (quoting 1 Newberg & Conte, *Newberg on Class Actions* § 3.13 (3rd ed. 1992)). The Plaintiffs and the Putative Class Members interests are aligned. The Plaintiffs seek the same relief for themselves that they seek for the Putative Class Members, compensation for negligent infliction of emotional distress. The Plaintiffs have satisfied that typicality requirement.

## ADEQUACY OF REPRESENTATION (Fed. R. Civ. P. 23(a)(4))

The question of adequacy of representation involves two inquiries: (1) whether the class representatives' interests are aligned with the interest of the class; and (2) whether class counsel is capable of litigating the case. *Smoot v. Wiser Brothers General Contractors, Inc*., 2016 WL 1736498 (W.D. Wis. 2016) (citing *Gomez v. St. Vincent Health, Inc.,* 649 F. 3d 583, 592 (7th Cir. 2011), *as modified* (Sept. 22, 2011). The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625 (1997). This requirement is met when the class representative is part of the class and possess the same interest and suffers the same injury as the proposed class members. *Id*

at 595. In this case, the evidence shows that the Plaintiffs are part of the proposed class, that they have the same interest in recovering damages from the Defendant as the proposed class, and suffered the same injury, severe emotional distress. See Rieder Dec at 1. See also Smith-Williams Dec. at 2, Rivers Dec. at 2, Murphy Dec. at 2, Ristow Dec. at 2, Suhr Dec. at 2, Fuentes Dec. at 2.

Moreover, the Plaintiff have demonstrated their fitness to adequately represent the class by prosecuting this case for almost a year, by participating in discovery, and by willingly exposing their private health information for the benefit of the case and the proposed class. The Plaintiffs all understand the nature of the case, and as veterans of our armed forces, will support their fellow veteran Putative Class Members in prosecuting their claims. See *Id*. Likewise, they have an interest in holding the VA accountable for providing substandard care, especially considering that the Plaintiffs and Putative Class Members receive their healthcare from the VA. The Plaintiffs will fairly and adequately protect and represent the interests of each member of the class.

In looking at the adequacy of class counsel, courts consider "the work counsel has done in identifying or investigating potential claims in the action"; "counsel's experience in handling class actions, other complex litigation, and the types of clams asserted in this action"; "counsel's knowledge of the applicable law"; and "the resources that counsel will commit to representing the class." *Bauer v. Kraft Foods Global, Inc*., 277 F.R.D. 558 (W.D. Wis. 2012). The Plaintiffs retained competent counsel, experienced in litigation of this nature to represent them. The Plaintiffs have engaged The Downs Law Group, The Kishish Law Group and Doar, Drill & Skow, law firms with ample experience in class action and medical malpractice litigation, and with the resources available to effectively represent the Plaintiffs and Putative Class Members' interests and to ensure that this case is vigorously prosecuted. See Rieder Dec at 1. Over the past eleven months, Plaintiffs' counsel have demonstrated that they understand the applicable law and that they are committed to successfully resolving this matter for the Plaintiffs and Putative Class Members.

17

### B. Rule 23b Requirements

#### a. Predominance

Even after a proposed class has met the requirements of Rule 23(a), a Rule 23(b)(3) class must also demonstrate that "questions of law or fact common to the class members predominate over any questions affecting individual members. *Bell v. PNC Bank*, 800 F. 3d 360 (7th Cir. 2015) (citing Fed. R. Civ. P. 23(b)3). This requirement goes to the efficiency of a class action as an alternative to individual suits and tests whether "proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc.,* at 623. A proposed class of plaintiffs must prove the existence of a common questions, and one that predominates over individual questions, but it need not prove that the answer to that question will be resolved in its favor. *Bell* at 376. If the same evidence will suffice for each member to make a prima facia showing, then it becomes a common question. *Bell* at 378 (citing *Messner* at 815.).

In this case, common questions regarding the Defendant's liability predominate over any questions affecting individual class members. These questions are:  Did the Defendant adequately train its employees in the dental clinic to follow infection control standards? Did the Defendant adequately supervise its employees in the dental clinic to ensure that they were following infection standards?; Did the Defendant adequately train its employees in the dental clinic to report breaches of infection control?  Did the Defendant adequately supervise its employees in the dental clinic to ensure that they reported breaches of infection control standards? Was Dr. Schiller acting within the scope of his employment with the Defendant when he exposed the Plaintiffs and Putative Class Members to the risk of infection? The answers to these questions will determine whether the Defendant is directly or vicariously liable for negligent infliction of emotional distress.

That fact that class members still must prove individual issues of causation and damages do not prevent class certification. See *Bell* at 381(citing *Pella Corp.* at 394.). See also *Arreola v. Godinez*, 546 F. 3d 788, 801 (7th Cir. 2008) (Although the extent of each class member's personal damages might vary, district judges can devise solutions to address that problem if there are substantial common issues that outweigh the single variable of damage amounts). It is well established that, if a case requires determinations of individual issues of causation and damages, a court may "bifurcate the case into a liability phase and a damages phase." *McMahon v. LVNV Funding, LLC.,* 807 F. 3rd 872 (7th Cir. 2015) (citing *Mullins v. Direct Digital, LLC*, 795 F. 3d 654, 671 (7th Cir. 2015)). A class action limited to determining liability on a class wide basis, with separate hearings to determine-if liability is established-the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed.") *McMahon* at 876 (citing *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013).

### b. Superiority

A class may be certified if class treatment is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). The factors for determining whether class treatment is superior to other methods for resolving a case include: (A) the class members interest in proceeding individually; (B) the extent and nature of any litigation already begun by class members; (C) the desirability of concentrating the litigation in the particular forum, and; (D) the likely difficulties of managing a class action. Fed. R. Civ. P. 23(b)3(A)-(D).

These factors apply to this case as follows: (A) Plaintiffs' counsel has been retained by twenty of the Putative Class Members and none has evinced a desire to proceed individually. Indeed, many of the Putative Class Members would likely not have the resources to proceed individually;

(B) The Plaintiffs are not aware of any other litigation filed by the putative class members. In its Answer (D.E. 29 at 16), the Defendant acknowledges that it is also not aware of any other actions having been filed by Putative Class Members; (C) This is not a case in which the class members are scattered all around the country and proceeding under the laws of different states, where the determination of class wide issues would require the Court to "create a composite legal standard that is the positive law of no jurisdiction." See *Mejdrech v. Met-Coil Systems Corp.,* 319 F. 3d 910 (7th Cir. 2003). The acts and omission in this case took place in Monroe County, Wisconsin and the Plaintiffs and Putative Class Members are proceeding under the same federal and state laws. See *Id*., and; (D) "If judicial management of a class action…will reap the rewards of efficiency and economy for the entire system that the drafters of the federal rule envisioned, then the individual judge should undertake the task." *Mullins v. Direct Digital*, LLC., 795 F. 3d 654 (7th Cir. 2015). In this case, determining common issues directed at the Defendant's liability on a class wide basis will be far more efficient and economical for the Court than duplicative discovery and multiple trials addressing the same liability issues.

WHEREFORE for all the foregoing reasons, the Plaintiffs request that this Court issue an order granting class certification.

Respectfully Submitted,

By:

*s/ William Rieder*
William Rieder, Esq.

William T. Rieder, Jr., Esq.
The Downs Law Group
3250 Mary Street, Suite 307
Coconut Grove, FL 33133
Telephone No.: (305) 444-8226
Facsimile No.: (305) 444-6773

wrieder@downslawgroup.com
FL Bar No. 0044834
*Co-Counsel for the Plaintiffs*

Matthew A. Biegert., Esq.
Doar, Drill & Skow
103 North Knowles Avenue
P.O. Box 388
New Richmond, WI 54017
Telephone No.: (715) 246-2211
Facsimile No.: (715) 246-4405
mbiegert@doardrill.com
WI Bar No. 1000368
*Co-Counsel for the Plaintiffs*

C.J. Kishish, Esq.
Kishish Law Group
1555 Southcross Drive West
Burnsville, Minnesota 55306
Telephone No.: (888) 402-5552
ckishish@kishishlawgroup.com
MN Bar No. 0229805
*Co-Counsel for the Plaintiffs*