IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CONSUELA SMITH-WILLIAMS,
FRED RIVERS, RICHARD MURPHY,
ROBERT RISTOW, ROGER SUHR, and
SALVADOR FUENTES,[1]

|  |  |
|---|---|
| Plaintiffs, | OPINION AND ORDER |
| v. | 17-cv-823-wmc |
| UNITED STATES OF AMERICA, |  |
| Defendant. |  |

Plaintiffs filed suit against the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1) (the "FTCA"), for lapses in infection control procedures at the Tomah VA Medical Center.  Plaintiffs bring two types of negligence claims: (1) negligent infliction of emotional distress and (2) negligent training, supervision or retention.  Presently before the court is defendant's motion for summary judgment on all claims, which does not challenge plaintiffs' *prima facie* claims, but instead argues that the latter negligence claim is barred by the discretionary function exception and that both are barred by public policy. (Dkt. #89.)  For the reasons explained below, defendant's motion will be granted in part and denied in part.

---

[1] In light of the court's denial of class certification (dkt. #88), the court omits language "on behalf of themselves and others similarly situated" from the caption above.

UNDISPUTED FACTS[2]

**A. Background**

The plaintiffs are all veterans of the United States' armed forces who live in Wisconsin. They all received dental care from Dr. Thomas Schiller between October 2015 and October 2016 at the Tomah VA Medical Center's Dental Clinic located in Tomah, Wisconsin ("Tomah VA"). The Veterans Health Administration is part of the United States Department of Veterans Affairs and operates the Tomah VA Medical Center, including the Dental Clinic.

Dr. Schiller began as a staff dentist at the Tomah VA Medical Center on October 5, 2015, where he worked in the Center's Dental Clinic until October 21, 2016. In that position, Schiller was responsible for providing dental care, including bridges, crowns, dentures, extractions, filling cavities, oral examinations, and root canals. He also attended monthly staff meetings held in the clinic.

There is no dispute that at times during this period, Dr. Schiller failed to wash his hands, wear appropriate personal protective gear, and use sterile, non-personal dental burs.

---

[2] Viewing the evidence and all reasonable inferences in the light most favorable to plaintiffs as the non-moving party, the following facts are material and undisputed for purposes of summary judgment, except where noted below. At the outset, however, the court rejects defendant's repeated assertion that, because "[p]laintiffs' response proposes a new fact that is not directly responsive," it "should be disregarded." (*See* Def.'s Reply to Pls.' Resp. to Def.'s PFOF (dkt. #136) ¶¶ 3, 5-7.) As set forth in the court's summary judgment procedures, plaintiffs may propose their own "version of the facts and refer to evidence that supports that version." (Pretrial Packet Summary Judgment Procedures (available at dkt. #22) 5.) While ideally plaintiffs' counsel would have set forth a separate set of additional, discrete proposed finding of fact unless directly responsive, nothing in the court's procedures require that proposed findings in the response be "directly" related to defendant's original proposed findings to be considered. Additionally, the United States' contention that it "has submitted uncontroverted evidence" falls flat in light of plaintiffs' citation to contradictory deposition testimony. (*See* Def.'s Reply to Pls.' Resp. to Def.'s PFOF (dkt. #136) ¶¶ 16-17.) Finally, its argument that the record is "conclusive" is likewise misplaced where a reasonable jury could conclude that a contemporaneous certification was false.

These failures were all breaches of the standards of care established by OSHA, the CDC, ADA and Department of Veterans Affairs.  Moreover, lapses in such basic infection prevention practices can result in patient-to-patient transmission blood borne pathogens, allowing infected patients to serve as an indirect source of pathogens for disease transmission to other patients.  Finally, front-line staff are frequently the first to notice unsafe practices, but if they do not feel free to report them, then the problem remains unrecognized, such that unsafe practices continue unchecked.

## B. Schiller's Training & General Misconduct

### 1. As New Employee

When Schiller started working as a staff dentist at the Tomah VA Medical Center, he had over 28 years of experience as a dentist.  Schiller also considered himself knowledgeable about handwashing, equipment sterilization, and wearing protective equipment, although he acknowledged that when he was in private practice, he was not responsible for infection control.  (Schiller Dep. (dkt. #98) 25:12-22, 89:11-15.)

Nevertheless, at the start of his employment with the Tomah VA, Schiller participated in mandatory, new-employee training.  While the parties agree that this orientation lasted two days, they disagree about the specific information covered.  (*See* Def.'s Reply to Pls.' Resp. to Def.'s PFOF (dkt. #136) ¶¶ 5-7.)  At his deposition, Schiller testified that he had a two-week orientation at the dental clinic and then two days with Dr. Fisher before being permitted to treat patients.  (Schiller Dep. (dkt. #98) 15:5-18.) During the training with Fisher, Schiller learned how to enter data into the computer

system,[3] but maintains that Fisher did *not* cover infection control procedures, sterilization of equipment, or use of personal supplies.  (*Id.* at 15:19-16:17.)

The Tomah VA required new medical providers to review the Medicine Service Orientation Plan, which is a guideline for the information covered during orientation with a new medical or dental provider.  Items on this Orientation Plan that do not apply to a provider's specialty are crossed out as "not applicable."  After reviewing all the pertinent information on the Orientation Plan, the provider signs the bottom of the form to verify completion.  The parties dispute whether Schiller received a copy of the VA's policy that expressly prohibits personally owned reusable equipment, but there is no reasonable dispute that Schiller signed off on his Orientation Plan on October 23, 2015.  (Def.'s Reply to Pls.' Resp. to Def.'s PFOF (dkt. #136) ¶ 21.)

Schiller also testified that he never received a training manual, even though he certified that he completed his 2015 and 2016 mandatory training and education. (Compare Schiller Dep. (dkt. #98) 28:14-16 *with* Schiller Learning History (dkt. #96-4) 2, 5.)  The Tomah VA provided copies of the Training Booklet to employees every year as a matter of standard practice, at which point it required each employee to certify their familiarity with the Training Booklet's contents.  This training booklet or manual outlined the ePER system, as well as addressed infection control, including explaining the importance of using appropriate personal protective equipment and practicing hand

---

[3] Schiller testified that he was not aware of ePER, the system for reporting adverse patient events, and he acknowledged making documentation errors in patient medical records, which he blamed on his "very bad or poor" training.  (Schiller Dep. (dkt. #98) 46:10-22.)

hygiene. In particular, the manual explained that employees should practice hand hygiene before putting on and after taking off gloves, before and after touching a patient, and after touching inanimate objects in the room. The "Infection Control Bloodborne Pathogen (BBP) Training" section of the manual also provided employees with information about bloodborne pathogens, their transmission, and control and prevention, as well as specifically discussed the risks of Hepatitis B, Hepatitis C, and HIV, including workplace practices for employees to follow to avoid contracting these diseases.

Schiller also signed off on his 90-day placement follow-up on January 25, 2016. On that form, he checked the line acknowledging that he had "received orientation on fire and safety, infection control, safe operation of equipment (where applicable), and security practices in the unit." (90-Day Placement (dkt. #97-3) 2.)

### 2. Continuing Education

Tomah VA further required all dental and medical professionals to take supplemental infection control training. Nurse Melissa Moore conducted these supplemental trainings and addressed a variety of topics, including hand hygiene compliance, available infection control resources, and common healthcare-associated infections. She also provided her students with a seven-page Bloodborne Pathogen Education handout that described bloodborne pathogens, their transmission, and risk of exposure. That handout specifically identified and differentiated between Hepatitis B, Hepatitis C and HIV, as well as explained how employees could protect against contracting them. Schiller attended this training. (Moore Suppl. Decl. (dkt. #) ¶ 5.)

Schiller also took other, continuing education classes during his employment.

Indeed, Schiller certified that he completed dozens of trainings over the course of his employment.   One of the trainings Schiller completed was "Prevention of Workplace Harassment / No Fear Act," which he was required to complete within 90 days of hiring and again every two years.  The goal of this training is to promote a diverse, fair, inclusive, and harassment-free work environment.[4]   This program incorporated the VA's policy against sexual harassment.

Still, Schiller considered his training to be sporadic and incomplete.  (*See* Schiller Dep. (dkt. #98) 14:7-15.)  Specifically, Schiller testified that he did not receive "any copies of policies or procedures," but acknowledged being "made aware" of them, including those concerning sanitizing or disinfecting items, handwashing, and personal protective clothing. (Schiller Dep. (dkt. #98) 28:17-25, 53:19-54:9, 54:13-20.)  Schiller also reported that he only became aware of the Tomah VA's policy on reusable burs after working there "for two to three months."  (*Id.* 51:22-52:1.)

On the other hand, during the February 2016 meeting, staff learned that hand-hygiene would be increasingly monitored, such that staff would discretely monitor the hand-hygiene practices of others.  In addition, the clinic's infection control standards are attached to the minutes for both the June and July 2016 staff meetings.  Schiller attended all three of these meetings.

Finally, concerned that he "was not trained adequately" during his employment, Schiller testified that he thrice complained about his work environment, which resulted in

---

[4] In addition, dental assistants Sara Anderson, Lori Cleaver, Lisa Randall, Lisa Schroeder, and Sarah Wagner all completed this No Fear Training during Schiller's employment.

errors "due to one person telling [him] one thing, one telling [him] another, so there was no accurate direction sometime." (*Id.* 27:14-28:5.)  According to Schiller, the Chief of Dental Services, Frank Marcantonio, simply suggested he "take a walk" to calm down after expressing frustration with his lack of training, and he never received any concrete response to his complaints.  (*Id.* 28:6-10.)

### 3.  Infection Control Breaches

In December 2015, roughly two months into his employment, Schiller began using his own, personal posts, matrix bands, and dental burs during certain dental procedures.[5] While Schiller discarded the matrix bands and posts after a single use, he would use dental burs on more than one patient.  As part of his procedures for operations, Schiller acknowledging keeping a bur block with ten to twelve burs of his own in a drawer in the operatory.  However, Schiller did not use these dental burs exclusively, and he was unable to make any estimate as to how many times he may have used his own dental burs on a patient.  When he did use one of his personal burs following the posterior crown or bridge procedure, Schiller testified to sterilizing the bur via "cold-soak" method, which involves spraying the bur with Virex, letting it sit for ten minutes, and then cleaning it with a steel brush.  Following this procedure, Schiller would place the bur at the back of the rotation line.  Finally, Schiller would use a bur on two or three patients before throwing it out because it would become too dull for use.

---

[5] "Matrix bands" are sometimes used during a tooth filing procedure or root canal procedure to prevent filling material from pushing out.  "Posts" are used during some root canal procedures to stabilize teeth where there is not enough structure to support the so-called "buildup process" following a root canal.  Dental "burs" are used in posterior crown and bridge procedures to grind down or otherwise shape teeth.

In December 2015, Lori Cleaver first witnessed Schiller using his personal equipment on a patient.  Over the course of the year she worked with him, she personally observed him reuse dental burs on multiple patients and never saw him wash his hands (or use an alcohol-based hand sanitizer) in her presence in between patients, but she acknowledged he could have washed his hands after leaving the exam room.  Although Cleaver consistently observed him wearing protective gloves, which he changed between patients, she would also witness him touching non-sterile objects on occasion and then continue to work on a patient without changing his gloves.  Nor did Schiller consistently wear a gown.

In contrast, Schiller contended that he always washed his hands between patients, along with changing gloves, while acknowledging not always wearing a protective gown.  Similarly, Schiller acknowledged that he might have sometimes touched non-sterile items in the operatory before continuing to treat a patient without changing gloves, or at least could not deny that occurred.  Schiller also acknowledged being aware of the Tomah VA's policy against reusing burs and using his own equipment.[6]  By way of explanation for his deviations from policy, Schiller testified that management did not reinforce them and he was more comfortable -- and therefore more efficient -- using certain of his own instruments.

Lori Cleaver's own standard practice as a dental assistant involved using Virex II/256 to wipe down surfaces thoroughly between patients in the operatory, including any

---

[6] Schiller testified that he would have ceased using his personal equipment if someone had told him to remove, get rid of, and never use again personal equipment kept in his operatory.

object the dentist might have touched during the previous appointment. There is *no* dispute that Cleaver informed Chief of Dental Services Marcantonio about Schiller's reuse of personal protective equipment, his poor hygiene, and his practice of occasionally appearing to be sleeping at his desk. Another dental hygienist was also aware of Schiller's use of unsterile dental burs. (*See* Ans. (dkt. #29) ¶ 12.)

Nevertheless, no one within the dental clinic staff, including Marcantonio, reported Schiller's actions to management outside the dental clinic. Tomah VA Facility Director Victoria Brahm blames this failure on the prior director, who permitted a culture of fear to grow and fester at that facility, as opposed to fostering a "see something, say something" culture. Moreover, while defendant contends her deposition testimony is limited to the time period before she became director in October 2015, Brahm actually testified the Tomah VA facility was "in the middle of shifting [in] the right direction" during the time that Schiller was working there. (*See* Brahm Dep. (dkt. #46) 36:15-37:20.)

In mid-October 2016, a substitute dental hygienist also saw Schiller use an unsterile dental bur while treating a patient. When Schiller was out of the clinic on October 20, 2016, that substitute dental hygienist reported what she had seen to the acting chief of dental services. The acting chief then reported the incident to more senior managers of Tomah VA Medical Center on October 21, 2016. When confronted, Schiller admitted using and re-using unsterile dental burs, adding that he believed this was a common practice in the private sector, at which point Schiller was removed and suspended from the dental clinic. After Tomah VA leadership outside the dental clinic became aware of the infection-control policy breaches, they authorized an infection control nurse to conduct a risk assessment. After she confirmed deviations from infection controls, but concluded

that the risk of infection to the patients was low, the VA leadership fired Schiller.[7]

### C. Subsequent Investigations

#### 1. CERT

On October 26, 2016, Director Brahm further appointed William O'Brien "as the fact-finder to determine the situation involving a dental provider utilizing his own supplies when providing direct patient care on Veterans." (Oct. 26, 2016 Memo. (dkt. #122-6) 1.) As part of his mission, O'Brien was to determine whether other employees: (1) were aware that Schiller had been "using his own supplies when treating patients"; (2) considered Schiller's actions "inappropriate"; (3) who were knowledgeable reported Schiller's misconduct and, if so, to whom, and if not, why not; and (4) had additional information to share. (*Id.*)

O'Brien then produced an evaluative report based on his inquiry. Within a week of the report, the Deputy Undersecretary for Health and Operations convened a Clinical Episode Response Team ("CERT"). Although CERT's initial assessment found the risk faced by Schiller's patients was "high," a further investigation and risk assessment concluded that Schiller's patients were at a "low risk" of developing Hepatitis B, Hepatitis

---

[7] Ultimately, the Tomah VA leadership also punished Lori Cleaver, Schiller's assigned dental assistant, for failing to report his lack of infection controls for over a year. Unlike Schiller, however, she remains employed by the VA Medical Center, likely because the Facility Director Braham was of the opinion that Cleaver bears some responsibility for this ordeal, but credits, at least in general terms, her claim that she was afraid to report Schiller outside the dental clinic for fear of reprisal.

C, and HIV.[8]  (*See* Report (dkt. #34-2) 23-24.)

### 2.  OIG Investigation

At the request of U.S. Senators Baldwin, Grassley, and Johnson and Representatives Kind and Waltz, the VA Office of Inspector General (the "OIG") also conducted a legally authorized, separate investigation to assess improper dental infection control practices at the Tomah VA Medical Center.  The OIG concluded that Schiller *potentially* exposed 592 patients to blood borne pathogens due to improper infection control practices at the Tomah VA Medical Center Dental Clinic between October 2015 and October 2016.  The OIG further concluded that Schiller continued breaching infection control practices for so long because of a failure by other dental clinic staff to report the breaches, as well as problems with inspections of the dental clinic (such as providing advance notification of inspections).  The OIG next "found no documentation that facility leadership [including the chief of dental services] counseled Dentist A for poor hand hygiene, the noncompliant use of PPE, sleeping at his desk, or the use of non-VA unsterile burs."  (OIG Rpt. (dkt. #122-1) 6, 18.)  Finally, the OIG Report "found four opportunities between October 2015 and October 2016 when Dental Clinic inspections conducted by different groups . . . might have revealed noncompliance with facility and VHA directives, handbooks, and policies regarding infection control," including that the Compliance Environment of Care "should

---

[8] In contrast, plaintiffs flatly contend that:  "On November 7, 2016, the CERT found that the risk faced by Dr. Schiller's patients was high."  (Pls.' Resp. to Def.'s PFOF (dkt. #118) ¶ 142 (citing Brahm Dep. (dkt. #46) 53:14-20); *see also* Pls.' Add'l PFOF (dkt. #120) ¶ 95.)  However, there are a number of problems with this contention: (1) the court was not provided the CERT report referenced in Brahm's deposition; (2) later deposition testimony from Brahm clarified that "newer information stat[ed that] the risk was low" (Brahm Dep. (dkt. #46) 54:2-13); and (3) the final report from the Office of Healthcare Inspections also concluded that the risk was "low."

have opened the operatory drawers in the Dental Clinic," which "may have discovered the unsterile burs." (OIG Rpt. (dkt. #122-1) 20.) The report (*Id.* at 26.)

### D. Patient Notice of Dental Lookback Clinic

Following the OIG Report, the Tomah VA implemented a process to notify all of Schiller's patients, create a dental "lookback clinic," and offer those patients medical counseling and free blood testing. In accord with that process, all 592 patients were notified by Tomah VA via letter that infection control practices that had not been followed by their dentist, their risk of infection was "low" in the VA's opinion, and blood testing was available at no charge.[9] (Notification Letter (dkt. #130-1) 1-2.) Each of the plaintiffs received that November 29, 2016, letter.[10]

At the time of this letter, Tomah VA Director Braham did not know that some of Schiller's patients had tested positive for HIV or Hepatitis *before* he treated them. Of the 24 patients who tested positive for Hepatitis C, two had a bridge or crown procedure performed by Schiller. Of the three patients who tested positive for Hepatitis B, none underwent a bridge or crown procedure performed by Schiller. The only HIV-positive patient treated by Schiller did not have a bridge or crown procedure performed by him. There is no dispute that Schiller's patients who were known to have chronic HIV or Hepatitis infections *potentially* could have transmitted these diseases to others if proper precautions were not followed. Of the 592 patients identified, however, only 57 had a

---

[9] The Office of General Counsel advised Director Brahm about the level of risk to disclose to patients.

[10] Plaintiff Ristow had also heard about the infection control breaches from a friend, who saw it on the news, before Ristow received the notification letter.

crown or bridge procedure performed by Schiller. It was after the November 29 notification letters went out that CERT also apparently amended its findings, reducing its own assessment of risk from high to low.

Through the lookback clinic, the Tomah VA offered all 592 patients blood testing. Almost all of Schiller's patients reported for testing; only 47 or 48 declined to do so.[11] The appropriate lab protocol was partially designed by the Office of Public Health Surveillance and Research Department. Fortunately, there have been no *new* positive cases of HIV, nor of Hepatitis B or C.[12]

### E. Schiller's Treatment of Plaintiffs

Schiller performed dry socket treatments, filled cavities, and did oral evaluations for the plaintiffs.[13] The plaintiffs' dental records specifically reveal the following

---

[11] For those patients who declined to undergo blood testing, the United States flagged their medical records so their primary care physicians could at least have follow-up discussions with them.

[12] While some individuals tested positive, the VA provided genomic testing to ensure that "no one contracted something new." (*See* Brahm Dep. (dkt. #46) 60:11-61:6.) This follow-up testing was performed by the VA Public Health Reference Laboratory with consultation by the chief of infectious diseases at the Madison, Wisconsin, VA hospital.

[13] Plaintiffs contend that Smith-Williams also had a crown procedure performed by Dr. Schiller. (Pls.' Resp. to Def.'s PFOF (dkt. #) ¶ 56.) As defendants argue, however, a party generally cannot create a dispute of fact to survive summary judgment by contradicting earlier interrogatory responses via deposition testimony. In her interrogatory response, Smith-Williams stated that she twice saw Schiller "for bridge work." (Smith-Williams Interrog. Resp. (dkt. #33-12) 1.) Likewise, her treatment records show she saw Schiller for a filling and an oral exam. (Smith-Williams Treatment Notes (dkt. #57-1) 3, 7.) Finally, plaintiffs' citation to Schiller's deposition acknowledging that there were documentation errors in his medical records also does not create a dispute of material fact. (*See* Schiller Dep. (dkt. #98) 46:10-22; *id.* at 75:13-22.) In short, absent some contrary evidentiary support, or at least a plausible explanation for Smith-Williams' now contradicting her own formal, sworn interrogatory response and *all* contemporaneous dental records, she is bound by that response, at least for purposes of the pending motion for summary judgment.

appointments:

| Plaintiff | Date of Appointment | Procedure(s) |
|---|---|---|
| Robert Ristow[14] | October 29, 2015 | Oral evaluation |
| Fred Rivers[15] | November 24, 2015 | Oral evaluation |
| Roger Suhr | December 1, 2015 | Oral evaluation |
| Consuela Smith-Williams[16] | February 24, 2016<br>April 6, 2016 | Oral evaluation<br>Cavity Filling |
| Richard Murphy | March 7, 2016 | Oral evaluation |
| Salvador Fuentes | June 22, 2016 | Dry Socket<br>Treatment |

An oral evaluation typically involves a dentist examining a patient's gums and teeth for dental problems; it is non-invasive. Dry socket treatments are required following a tooth extraction when a blood clot becomes dislodged, exposing the underlying bone and nerve tissue. During this procedure, a dentist irrigates debris out of the socket before packing the area with medicated numbing paste to encourage healing. Cavity filling involves the removal of decayed tooth via drilling and then filling the area to prevent further decay. While a dentist would typically use a dental bur during this procedure, the kind of dental bur involved would differ from that used during bridge and crown procedures, which actually grinds the affected tooth into shape.

None of the plaintiffs remember whether Schiller wore a gown for their

---

[14] At his deposition, Ristow testified that he saw Schiller two days in a row at the end of October to have cavities filled.

[15] Rivers does not recall the actual treatment he received at this appointment.

[16] Smith-Williams testified that she "believed" she saw Schiller three or four times, including now for crown-related work as discussed above. Her medical records, however, show all her crown-related work at Tomah was performed in 2013 and 2014, well before Dr. Schiller even arrived in October 2015. While plaintiffs would dispute this based on Schiller's acknowledgement that he "made errors in documentation" (Schiller Dep. (dkt. #98) 46:10-22), Schiller also testified that he would not have omitted procedures. (*Id.* at 75:13-22.)

appointments.  Most do not recall his hand hygiene practices, including whether he touched any non-sterile objects in the operatory.  On the other hand, Murphy remembers Schiller walking into the exam room saying "let's have a look" before sticking his bare hands into Murphy's mouth.  Murphy did not report Schiller's failure to wear gloves to anyone at the Tomah VA; rather, that incident "just kind of slipped [his] mind after the exam until [he] got the [notification] letter."  (Murphy Dep. (dkt. #101) 24:15-22.)  He also did not include this in his interrogatory responses, but instead first mentioned it during his deposition.  The only other detail about the appointment Murphy recalls is that Schiller touched a tray and a light.  During the appointment, however, Murphy was not concerned or distressed about Schiller's failure to wear gloves.

Following their receipt of the November 29 Notification Letter, each plaintiff took a blood test; they all tested negative for Hepatitis B and C, as well as HIV.  Nevertheless, they each report suffering from severe emotional distress from the time they received the notification letter until they received their negative test results.  (*See* Fuentes Dep. (dkt. #100) 44:23-46:8 (testifying he "was stressed the fuck out," experienced "a lot of emotions," and that the experience triggered "all the feelings that [he] went through in Iraq"); Murphy Dep. (dkt. #101) 20:19-25, 31:8-16 (testifying he "was terrified" upon receiving the letter because of "[t]he possibility of being exposed to something that could eventually kill [him] or anybody that [he] was intimate with," and that the notification letter triggered PTSD-related night sweats and nightmares); Ristow Dep. (dkt. #102) 37:3-25 (testifying that "when [he] get[s] something in [his] head, it's like . . . watching the movie 'Groundhog Day'; it just keeps going around and around and around.  The thought of going through everything . . . and [then] end up getting infected with AIDS or HIV by

15

a dentist that wasn't doing it right, and a staff that never called him out on it, was just nerve wracking to [him]" (capitalization altered)); Rivers Dep. (dkt. #103) 43:6-9, 45:4-7 (testifying he "was nervous" and scared and that the notification letter "was a death notice"); Smith-Williams Dep. (dkt. #104) 18:25-19:10 (testifying she "was floored, mad, angry, upset, puzzled, [and] frustrated").)  A number of the plaintiffs were also concerned about passing on any infection to their loved ones and how their families would otherwise be impacted.  (*See* Fuentes Dep. (dkt. #100) 52:2-53:22; Ristow Dep. (dkt. #102) 42:5-18; Rivers Dep. (dkt. #103) 46:1-14; Smith-Williams Dep. (dkt. #104) 35:19-36:9; Suhr Dep. (dkt. #105) 19-10-15.)

### F.  Expert Opinions

Not having consulted any of the original risk assessments, the United States retained Dr. David Pegues as an infectious disease expert specifically for this lawsuit. Plaintiffs also retained Dr. Anthony Cumbo as their expert on infectious disease and hospital administration.  Both experts agree on a number of fundamental facts: (1) the Hepatitis B virus can live outside the body for at least a week, while the Hepatitis C virus can live outside the body for up to six weeks; (2) plaintiffs were placed at risk of infection with these illnesses; and (3) hand hygiene practices are important in reducing the risk of transmitting infections.

That said, the experts do *not* agree on everything.  Defendant's expert Pegues opined that the range of risk of infection to plaintiffs was extremely small, ranging from between 1 in 3.3 billion to 1 in 98,000.  In reaching these opinions, he "assumed the risk was the same in all patients" where Schiller was alleged to "not engage in hand hygiene or touched

16

environmental surfaces." (Pegues Dep. (dkt. #129) 83:24-84:11.) Pegues also assumed that Schiller observed proper hand hygiene 80% of the time, based on a study that was conducted outside the United States. He likewise assumed that Schiller was not infected with a virus.[17] While Pegues assumed only mucus membrane exposure, he recognized that if a patient were bleeding in their mouth, they would be at a higher risk of infection from viral exposure. He also assumed that the dental assistant's use of Virex reduced the viral load of surfaces in the operatory by 1000 times.

In contrast, Dr. Cumbo opined that Schiller's actions "put patients at significant risk of infection with Hepatitis B and C virus, and to a lesser extent, HIV infection." (Cumbo Rpt. (dkt. #109) 3.) He added that "all patients seen by Dr. Schiller were placed at actual risk of cross infection especially with Hepatitis B and C," while "the patients who underwent invasive bur procedures were placed at a high risk of infection." (*Id.*) Regardless, he considered the risk of Hepatitis infection to be more than negligible, although explaining that it was not possible to assign a specific percentage risk faced by all of Schiller's patients because of individualized factors, such as whether the source patient had an active infection, whether the active infection was being treated, and how the virus was transmitted. Cumbo also did not consider Cleaver's practice of wiping down all surfaces touched by the dentist in the operatory with Virex to be sufficient, as there are things that "are hard to decontaminate completely." (Cumbo Dep. (dkt. #128) 83:16-87:19 ("I don't think that mouses and keyboards and everything else is wiped down completely"; "[Y]ou can't be 100 percent sure that something is disinfected"; "It's usually

---

[17] At the time of his deposition, Schiller did not know if he was infected with HIV or Hepatitis.

wiped down with a bleach towel or something like that and you're going to get the flat surfaces, but the surfaces are porous so virus can live in there and there are cracks and that's where these things tend to live.").

OPINION

Summary judgment is appropriate if the moving party establishes that "there is no genuine dispute as to any material fact . . . entitl[ing it] to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Defendant does not attempt to poke holes in plaintiffs' *prima facie* claims of negligent infliction of emotional distress or negligent training, supervision or retention.   Instead, the defendant contends that it is entitled to summary judgment because:  (1) the discretionary-function exception to the Federal Tort Claims Act bars recovery for hiring and supervisory decisions; and (2) public policy prevents plaintiffs from recovering for emotional distress injuries.  (Mot. Summ. J. (dkt. #89) 1; Summ. J. Br. (dkt. #90) 2-3.)  The court addresses both grounds in turn below.

## I.  Federal Tort Claims Act

"The United States as sovereign is immune from suit unless it has consented to be sued," and the FTCA "provides a limited waiver of immunity" by creating "a cause of action for tort claims 'caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment.'"  *Lipsey v. United States*, 879 F.3d 249, 253 (7th Cir. 2018) (quoting 28 U.S.C. § 1346(b)(1)).  In turn, the discretionary-function exception is an affirmative defense barring liability for "the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion

18

involved be abused." 28 U.S.C. § 2680(a). "[T]he purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Moore v. United States*, No. 17 C 795, 2018 WL 1035872, at *3 (N.D. Ill. Feb. 22, 2018) (quoting *United States v. Gaubert*, 499 U.S. 315, 323 (1991)).

For the discretionary-function exception to apply, however, "the act at issue must be discretionary rather than mandatory, in that it involves an element of judgment or choice" and "the government actions and decisions must be based on considerations of public policy." *Lipsey*, 879 F.3d at 254. Put another way, the discretionary-function exception applies to acts not mandated by "federal statute, regulation or policy" that Congress intended to shield from liability. *See id.*; *Alinsky v. United States*, 415 F.3d 639, 647 (7th Cir. 2005) (describing the two factors as "whether the government employees violated a specific mandatory statute, regulation, or policy, and second, whether the conduct involved was the type of conduct that Congress intended to shield from liability"). In contrast, decisions resulting from an individual's carelessness, as opposed to the exercise of discretionary judgment, may not be protected by the discretionary function exception.

In *Palay v. United States*, 349 F.3d 418, 431 (7th Cir. 2003), the Seventh Circuit suggested that the discretionary function exception would not apply to prison officials' failure to protect an inmate from a fight between other inmates if, for example, the officer had fallen asleep or stepped out for a snack when the altercation broke out. *Id.* at 431. "That type of carelessness," the court reasoned, "would not be covered by the discretionary function exception, as it involves no element of choice or judgment grounded in public policy considerations." *Id.* at 432. The Eighth Circuit has applied similar reasoning to the

careless acts of individuals charged with supervising other employees. For example, in *Tonelli v. United States*, 60 F.3d 492, 496 (8th Cir. 1995), the court recognized that a supervisor's "[f]ailure to act after notice of illegal action does not represent a choice based on plausible policy considerations." *Id.* at 496.

Defendant argues that while the FTCA serves as a limited waiver of the government's sovereign immunity, the "discretionary-function exception" applies to all employment and supervisory decisions by their very nature. (Summ. J. Br. (dkt. #90) 26.) Plaintiffs argue that the discretionary-function exception does not apply here because the United States "had mandatory infection control policies in place[,] as well as policies mandating that the Chief of Dental Services ensure that the Dental Clinic comply with these infection control policies," and that Marcantonio, as the Chief of Dental Services, "was not making policy-based decisions when he ignored these policies." (Opp'n (dkt. #116) 27.)

There is no dispute that in 2013 the United States published the "Veterans Health Administration Dental Program" and "Infection Control Standards for VA Dental Clinics," which established guidelines for VA Dental Programs based on standards from the ADA, OSHA and CDC. Among other things, these standards govern proper hand hygiene, personal protective equipment, and processing of reusable medical equipment. Certainly, these standards allowed for a certain degree of discretion in their implementation. Indeed, the Infection Control Standards provided that "a single VA dental infection control policy that fits all dental clinics is not realistic" so each one "needs to create its own policy, based upon VA standards, including the standards in this document." (Infection Control Standards (dkt. #122-4) 7.)

20

Nevertheless, both the VHA Dental Program and the Infection Control Standards included specific, mandatory infection control practices.  (*See, e.g.*, *id.* at 18 ("Once used intra-orally, all burs must be disposed."); *id.* at 9 (describing specific instances when "hand hygiene" should be accomplished); *id.* at 12 (requiring personal protective equipment for certain clinical procedures).  Further, the VHA Dental Program tasked Marcantonio, as Chief of Dental Services, with "[e]nsur[ing] that the facility dental program complies with VHA regulations, directives, handbooks, and policies pertaining to dental clinic operations."  (VHA Dental Program (dkt. #122-3) 3.)

Under these standards, therefore, Marcantonio was required to ensure compliance with the Tomah VA's mandatory infection control practices, and any failure on his part to do so was, therefore, not an exercise of "discretion" protected by sovereign immunity.  Here, the alleged failure is even more than careless supervision or even taking no apparent steps to ensure ongoing compliance by use of unannounced audits or encouraging whistle blowing, but allegedly to foster an atmosphere of *non*-reporting *and* instructing Schiller and his nursing staff on how to cover up non-compliance by removing his personal burs from the operatory before any announced safety audits.  Those allegations are enough for plaintiffs to proceed on at least some of their claims based on the defendant's failure to supervise.[18]

## II. Public Policy

Defendant additionally contends that public policy prevents plaintiffs' from

---

[18] The court will leave to motions *in limine* the question as to which non-discretionary acts may be introduced to the jury.

21

recovering under state law.  (*See* Mot. Summ. J. Br. (dkt. #90) 15-22.)  As the parties agree, the Wisconsin Supreme Court identified several public policy considerations that may preclude liability for negligent infliction of emotional distress:

> (1) whether the injury is too remote from the negligence; (2) whether the injury is wholly out of proportion to the culpability of the negligent tortfeasor; (3) whether in retrospect it appears too extraordinary that the negligence should have brought about the harm; (4) whether allowance of recovery would place an unreasonable burden on the negligent tortfeasor; (5) whether allowance of recovery would be too likely to open the way to fraudulent claims; or (6) whether allowance of recovery would enter a field that has no sensible or just stopping point.

*Bowen v. Lumbermens Mut. Cas. Co.*, 183 Wis.2d 627, 655, 517 N.W.2d 432 (1994).  In *Bowen*, the court held that "[w]hen it would shock the conscience of society to impose liability, the courts may hold as a matter of law that there is no liability."  *Id.* (citing *Pfeifer v. Standard Gateway Theater*, 262 Wis. 229, 238, 55 N.W.2d 29 (1952)).

The parties dispute whether the court should also apply the "contaminated source rule" to this case.  (*See* Summ. J. Br. (dkt. #90) 16-22; Opp'n (dkt. #116) 18-24.)  This rule requires a negligent infliction of emotional distress plaintiff to offer proof that her injury was caused by an item coming "from a contaminated source."  *Babich v. Waukesha Memorial Hospital, Inc.*, 205 Wis. 2d 698, 706, 556 N.W.2d 144 (Ct. App. 1996).[19] According to the Wisconsin Court of Appeals in *Babich*, this requirement "strikes a proper balance between ensuring that victims are compensated for their emotional injuries and

---

[19] In *Babich* the Wisconsin Court of Appeals dismissed an emotional distress claim stemming from an accidental contact with a hypodermic needle left in plaintiff's hospital bedsheets, which punctured her skin but ultimately did not cause infection.  Dismissal was appropriate because she lacked proof that the needle had contact with a "contaminated source" creating a risk of infection. *Id.* at 706.

that potential defendants take reasonable steps to avoid such injuries, but nonetheless protects the courts from becoming burdened with frivolous suits." *Id.* at 706-07. While the parties agree that Wisconsin courts have only applied this rule to needlestick cases, defendant contends that its rationale "applies equally to this case." (Mot. Summ. J. Br. (dkt. #90) 18.) Plaintiffs respond that the contaminated source rule only applies in needlestick cases, albeit that such cases may arise outside of healthcare. (Opp'n (dkt. #116) 24 & n.4 (citing *Alsteen v. Wauleco, Inc.*, 2011 WI App 105, ¶ 17, 335 Wis.2d 473, 802 N.W.2d 212 (Ct. App. 2011)).)

As explained in *Alsteen,*

> the *Babich* court stated that the [contaminated source] rule could apply 'in a variety of contexts' while discussing a needle stick case that occurred in a retail store. Thus, the court's 'variety of contexts' statement referred to the fact that needle stick injuries can arise outside the health care context. The court did not suggest that the contaminated source rule could apply in non-needle stick cases.

2011 WI App 105 ¶ 17. However, *Alsteen* is not a negligent infliction of emotional distress case, but rather a suit seeking future medical monitoring expenses because of increased risk of developing cancer due to toxic exposure. 2011 WI App 105 ¶¶ 1-2, 18.

As this court recognized in its motion to dismiss opinion, the factual underpinnings of this case are more analogous to a needlestick than a mass-pollution exposure. (Mot. Dismiss Op. & Order (dkt. #28) 6.) Likewise, the court noted that the *Babich* court examined three of the aforementioned considerations which are "well-suited to analyzing whether the contaminated source rule should apply to the unsanitary dental practices [at issue] here": (1) whether the "injury was proportionate to culpability; (2) whether imposing liability would unreasonably burden future defendants; and (3) whether imposing liability

23

would permit a reasonable stopping point."[20]   (Mot. Dismiss Op. & Order (dkt. #28) 7 (citing *Babich*, 205 Wis. 2d at 707-08).)   The parties largely focused on these considerations.

Defendant argues that the contaminated source rule should apply because plaintiffs "faced only negligible estimated risks of infection never greater than 1 in 98,000 (0.0000102%) for Hepatitis B, 1 in 1.2 million (0.00000083%) for Hepatitis C, and 1 in 3.3 million (0.0000003%) for HIV," making their risk of transmission "equally remote as the low risk in *Babich*."  (Mot. Summ. J. Br. (dkt. #90) 19.)  If it applies, defendant adds, plaintiffs cannot meet their burden because:  (1) none of the plaintiffs underwent treatment by Schiller requiring the use of his personal dental burs; and (2) none remember him engaging in other, allegedly negligent conduct.  (*Id.* at 19-20.)  Relatedly, defendant contends that regardless of whether the contaminated source rule applies, imposing liability is inappropriate because the negligible risk of infection made the risk of injury too remote to justify imposing liability and "is out of proportion to the United States' alleged culpability."  (Mot. Summ. J. Br. (dkt. #90) 20.)

Plaintiffs respond that the risk and defendant's culpability are distinguishable from *Babich* because: (1) Schiller put 592 people at risk due to his failure to follow infection control practices over the span of a year; (2) other VA employees knew about his breaches and failed to stop or report him; (3) Schiller's breaches were not just "careless[]"; (4) Schiller treated 28 patients who were known to have Hepatitis B or C or HIV, making

---

[20] At the motion to dismiss stage, the court declined to apply the contaminated source rule, in part, because there was no evidence about the "probabilistic risk of infection."  (Mot. Dismiss Op. & Order (dkt. #28) 7.)

them possible infection sources; and (5) Dr. Cumbo opined that the risk of infection was "more than negligible."[21] (Opp'n (dkt. #116) 19-22.)  Plaintiffs add that these infections can survive outside a person's body for a period of time and that Schiller's failure to observe proper hand hygiene practices -- the most important aspect of infection control, according to Dr. Cumbo -- put his patients at risk regardless of whether he reused his dental burs for a specific, risky procedure.  (*See id.* at 20.)

As plaintiffs point out, even if the court decided to apply the contaminated source rule despite Schiller's allegedly outrageous, ongoing malpractice, it likely is satisfied here because there is no dispute that Schiller treated 28 patients *known* to be infected with Hepatitis or HIV and, therefore, representing a concrete danger, especially as to Hepatitis transmission.  In particular, Schiller's hands and other items in the operatory may have been exposed to these viruses, and then possibly exposed the plaintiffs.  As plaintiffs point out, Wisconsin law only requires a showing that they were touched by a contaminated source, not that they were actually infected nor that any risk of contamination remains. (Opp'n (dkt. #116) 25.)  *See Babich*, 205 Wis.2d at 706 ("[r]equiring a needlestick victim to offer proof that the needle came from a contaminated source").  Accordingly, plaintiffs need not proffer evidence as defendant suggests.  (*See* Reply (dkt. #135) 12.)

Finally, if the risk is too remote, liability may still be inappropriate under Wisconsin law.  There is conflicting expert testimony about the amount of risk Schiller's patients faced from his breaches of infection control protocols.  Accordingly, the court will await trial

---

[21] As discussed, Cumbo would not assign a specific percentage risk faced by Schiller's patients, albeit due to individualized factors.  However, that one expert provides a calculated risk and another says that the risk cannot be calculated in that fashion suggests a factual dispute.

testimony to determine whether this consideration warrants precluding liability because of the remoteness of risk.  Likewise, the culpability of defendant compared to the risk posed to plaintiffs must wait for trial.  As does defendant's contention that permitting liability would unreasonably burden future defendants, discouraging them from notifying patients about potential infection control protocol breaches, which would contradict public policy goals.  (Mot. Summ. J. Br. (dkt. #90) 21-22.)

In response, plaintiffs argue that here, too, the case differs from *Babich*, where the court was concerned with wasted healthcare resources and the quarantining of HIV-positive individuals.[22]  (Opp'n (dkt. #116) 22-23.)  They add that imposing liability would "simply" force future defendants "to comply with established infection control standards," which would not be "needless or too costly," nor would "unlimited liability" be the result, but rather defendants would be further encouraged to adhere to professional standards. (*Id.* at 23-24.)

While defendants disagree -- again contending that permitting liability here would discourage healthcare providers from broadly notifying patients for fear of increased liability (Reply (dkt. #135) 13) -- the court does not find defendant's argument convincing, especially since there is undisputed evidence that at least some of the Tomah VA dental clinic staff knew about some of Schiller's infection control breaches.  Regardless, the court will benefit from a full trial record before conducting any remaining judicial balancing that may be required to decide whether defendant's possible liability is "unwarranted."

---

[22] Plaintiffs note that numerous cases have permitted claims like these to proceed, "and there is no evidence that these hospitals, or any other hospitals, have refused to treat patients infected with Hepatitis or HIV."  (Opp'n (dkt. #116) 23.)

26

ORDER

IT IS ORDERED that:

1) defendant's motion for summary judgment is DENIED; and

2) the clerk's office is directed to contact the parties to establish an early trial date for this matter.

Entered this 8th day of October, 2019.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

27